UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

vs.                                          2:05-cr-50-FtM-29SPC

WILLIAM EDWIN MOORE
_____

**OPINION AND ORDER**

         This matter comes before the Court on the following
suppression motions filed by defendant: (1) Motion to Suppress
Evidence and Derivative Evidence From Search of Motor Vehicle on
July 6, 2000 (Doc. #98), (2)  Motion to Suppress Evidence and
Derivative Evidence from the Search of Defendant's Motel Room on
February 1, 2005 (Doc. #99), and (3) Motion to Suppress Evidence
Seized During Execution of a Search Warrant in the Nighttime (Doc.
#100).  The government filed Responses (Docs. #105, 106, 108), and
the Court conducted an evidentiary hearing on March 6, 2006.

**I.**

     The Court finds the following facts were proven as to the
three relevant bank robberies in 2000 and the subsequent
investigations:

     On June 6, 2000, a white male wearing a baseball cap and
sunglasses robbed the Bank of America on Whiskey Creek Drive in
Fort Myers, Florida.  The robber gave an envelope to a teller,
ordering her to give him money.  The Lee County Sheriff's Office

(LCSO) responded to the bank and was the lead investigative agency. Among other things, LSCO detectives directed Crime Scene Technicians, obtained the bank surveillance video, had still photographs made from the video, and distributed the photographs to the media and other law enforcement agencies. Federal Bureau of Investigation (FBI) Special Agent James Roncinske also responded to the bank; he interviewed the victim teller with LCSO Deputy Crawford, viewed the surveillance tape, and obtained a copy of the still photographs.

On June 20, 2000, a white male robbed the Bank of America on Matthew Drive in Fort Myers, Florida.  The robber matched the description of the June 6, 2000 robber, and the surveillance photographs appeared to show the same person.  The Fort Myers Police Department (FMPD) was the lead investigative agency.  Among other things, FMPD Detective Dennis Keen obtained the bank surveillance video, made still photographs from the video, and disseminated them to the media and other law enforcement agencies. The photographs were of better quality than those from the June 6 bank robbery, and clearly depicted a large, silver ring on the robber's right hand.  Neither Special Agent Roncinske nor anyone else from the FBI responded to the bank on the day of this robbery. The next day Special Agent Roncinske made a neighborhood canvass and developed additional witnesses.  He also obtained a copy of the still photographs from the FMPD.  The FMPD released the still bank surveillance photographs to The News Press, who published one in

-2-

its newspaper.      Special Agent Roncinske began investigating defendant William Edwin Moore (defendant or Moore) on June 30, 2000, when he received a tip from a citizen who recognized Moore in the bank surveillance photograph published in the newspaper. Special Agent Roncinske reported this information to the LCSO and the FMPD.  On June 30 or July 1, 2000, Special Agent Roncinske began obtaining background information on defendant; he obtained defendant's driver's license and saw that he resembled the person in the bank surveillance photographs.  Special Agent Roncinske also determined defendant's address on McGregor Boulevard through public databases and other databases available to the LCSO, and determined from the property appraiser records that the owner of the property was Steven Loffreno.  The LCSO and the FMPD conducted several photo spreads with several tellers; Special Agent Roncinske was present for some, and not present for others.

On July 3, 2000, a white male matching the description of  the robber in both prior robberies robbed the South Trust Bank on North Cleveland Avenue, Fort Myers, Florida.   The LCSO was the lead investigative agency.  Special Agent Roncinske arrived at the bank and participated in the interview of the teller victim by LCSO Deputy Gary Norbusch.

On July 6, 2000, Special Agent Roncinske participated in a conversation with LCSO command officers about the fact that defendant had a suspended driver's license.  The LCSO command officers decided that their deputies would surveill defendant at

-3-

his apartment and would arrest him if they saw him drive a motor vehicle.

At approximately 6:15 p.m. on July 6, 2000, LCSO Deputy Brian Jakacki saw a white Dodge pick-up truck with an expired license tag traveling south on Summerlin Road near Colonial Boulevard. Deputy Jakacki does not recall knowing that the vehicle was being surveilled by other officers. The driver pulled the truck into a parking space at a Publix supermarket before Deputy Jakacki could turn on his emergency lights to conduct a traffic stop. As the driver was getting out of the truck, Deputy Jakacki pulled up with his emergency lights on. Jakacki made contact with the driver, identified as defendant Moore, just outside the vehicle and conducted a check of the license tag and defendant's driver's license. According to Deputy Jakacki, no other officers were present. Deputy Jakacki confirmed that the license tag had expired, and issued defendant a citation for expired tag. Deputy Jakacki also determined that defendant's driver's license had been suspended three times; defendant stated he was aware that his license had been suspended. Deputy Jakacki then arrested Moore for driving while license suspended, in violation of Florida Statute § 322.34(2), a misdemeanor criminal offense. Defendant was transported to the Lee County Jail; defendant's pit bull, which was in the truck, was taken by Animal Control; the pick-up truck was impounded and towed to the LCSO impound lot without being searched, although the LCSO policy was to inventory all impounded vehicles.

Deputy Jakacki's contemporaneous Probable Cause Statement, Government's Exhibit 6, is substantially consistent with this testimony. The FBI was not present at the arrest and had not ordered the arrest or the impoundment of the vehicle.

Defendant's version of this event is quite different. Defendant testified that he left his apartment to go to Publix and noticed an unmarked police car with two officers fall in behind him. The officers followed him to the Publix parking lot, which he entered off Colonial (not Summerlin) and parked. Defendant testified he got out of the truck and walked away. The plain clothes officers called defendant by name, and he stopped. The detectives approached defendant, who was 60 to 90 feet away from the vehicle, and told him they had received information about a truck matching his truck's description engaged in reckless driving on McGregor. The officers asked defendant to accompany them back to the vehicle, and feeling he had no choice defendant did so. As they approached the vehicle a uniformed deputy arrived. The officers asked defendant for his driver's license, which he did not have. He was then arrested for Driving While License Suspended or Revoked. After Animal Control took defendant's pit bull, the officers conducted a "short search" of his vehicle in the Publix lot but removed nothing. Defendant asked that his truck not be towed, and that he be allowed to make other arrangements for it, but the officers refused this request. Defendant testified that he

-5-

has never been able to determine the identity of the two plainclothes officers.

After being booked into the Lee County Jail, defendant was taken to the LCSO office at about 8 p.m. and interviewed by Special Agent Ronczinski and Lt. Randy Crone of the LCSO.  The interview began at 8:35 p.m.  Some of the factual details surrounding these events are set forth in the Report and Recommendation (Doc. #84, pp. 2-8); the Court adopts the magistrate judge's findings of fact with regard to these events, including the credibility determinations.  Special Agent Roncinske took the lead in the interview, since Lt. Chrone had no prior involvement or information concerning the bank robberies or defendant.  During the interview (and before the inventory search of the pick-up discussed below), defendant stated that in the afternoon of July 3, 2000, he had visited Richard Sahs in North Fort Myers (and thus had an alibi for the July 3 robbery).

In light of this, other LCSO officers interviewed Richard Sahs while Special Agent Roncinske interviewed defendant.  Sahs stated that a few hours after the July 3 robbery, he arrived home to find defendant, a friend of his, burning items in Sahs' barbecue grill. Law enforcement subsequently discovered a charred pair of glasses and other items in the grill.  Sahs also advised the officers that the person depicted in the bank surveillance photographs looked just like Moore, and that Moore had borrowed his loaded handgun during the time of the June, 2000 bank robberies and had returned

-6-

it the evening of July 3, 2000.  Sahs was then taken to the LCSO at about 9:30 or 10:00 p.m. (on July 6, 2000), where he was interviewed by Special Agent Roncinski and other officers.  At the time, Sahs was considered a possible getaway driver for the July 3, 2000, bank robbery.

While being interviewed, Lt. Crone learned that defendant's vehicle had not been inventoried at the scene, contrary to the LCSO's inventory policy, and left the interview to conduct an inventory search of the vehicle at the LCSO impound lot.  Lt. Crone testified that no one directed him to do so, and he wasn't even sure if Special Agent Roncinske knew he was doing it.  Since the omission was on his watch, he decided to correct it himself.  Lt. Crone called Crime Scene Technician (CST) Gabriele Suboch shortly after midnight, since she had the key and alarm code to the impound lot.  The inventory was conducted pursuant to the written policy of the LCSO.  Government's Exhibit 5.  CST Suboch completed the inventory form, Government Exhibit 3, as Lt. Crone did the actual inventory.  CST Suboch did not follow the procedures applicable for a non-inventory search for evidence.  The only item seized by Lt. Crone was a June 6, 2000, Money Corner Western Union money order wire transfer receipt for $900 plus a service charge in the name of Richard Sahs as sender and Triad Financial Corp. as receiver.  Lt. Crone seized this item because he thought it might be of some interest to Special Agent Roncinske.  The inventory form was signed and dated by CST Suboch on July 7, 2000, at 1:30 a.m.  Special

Agent Roncinke later confronted defendant with this document during his continuing interview.

Also during the custodial interview Moore was equivocal about giving consent to search his house.  The deputies and Special Agent Ronzinski discussed getting a search warrant, and it was decided to get a state court search warrant.  Detective Nosbusch prepared the affidavit for the search warrant.  On July 7, 2000, shortly before 1:45 a.m., while defendant was still in state custody, Detective Nosbush woke up a state court judge and obtained a state court search warrant for defendant's home.  The search warrant authorized officers to execute the warrant "in the daytime or nighttime as the exigencies of the occasion may demand or require . . ."  Detective Nosbush executed the search warrant on July 7, 2000, at 2:15 a.m. with the assistance of FMPD Detective Keen because he feared Moore would quickly be released from custody and would return to his apartment and destroy whatever evidence was there.  Detective Nosbusch directed the collection of evidence; Special Agent Roncinske and other deputies continued to interrogate defendant at the LCSO office.  Both officers executing the search warrant anticipated a state prosecution, not a federal prosecution.

At sometime on July 6, 2000, Detective Nosbush retrieved Moore's silver class ring from the Lee County Jail.

On July 8 or 10, 2000, Special Agent Roncinske went to the Money Corner and requested the store's June 6, 2000, video surveillance tape, which was no longer available.  Special Agent

Roncinske was able to obtain records pertaining to the June 6, 2000, wire transfer reflected on the Money Order receipt found in the truck.  No records were found for June 6, June 20, or July 3, 2000.

On July 10, 2000, Special Agent Roncinske interviewed Steven Loffreno, the owner of the rental property where defendant resided. Special Agent Roncinzke had no records from the Money Corner or Western Union relating to any payments to Loffreno, and did not know that defendant had purchased any money orders from the Money Corner for the payment of rent.  This interview did not include questions about money orders.

On July 11, 2000, Loffreno contacted Special Agent Roncinske and then came to the FBI office.  Loffreno stated that he had attempted to collect a rent payment from defendant on July 10, 2000, and had been given a Western Union money order for $500. Loffreno showed the money order to Special Agent Roncinske, who copied it.  The money order showed it had been purchased on July 3, 2000, at 7:10 p.m.  After calling Western Union, Special Agent Roncinske learned that the agent number on this money order belonged to the Money Corner store.  Loffreno also stated that Moore's rent had been past due for May, 2000, and that Moore had made a $900 cash payment for the rent just a few hours after the June 6, 2000, robbery.

On July 11, 2000, Special Agent Roncinzke interviewed Nina Brown.  Brown stated that in May, 2000 defendant told her he was

not working, was going to be thrown out of his apartment for not paying rent, and was hiding his truck at night so it would not be repossessed for not making payments.

On July 12, 2000, Special Agent Roncinske again went to the Money Store.  He obtained the surveillance tape from July 3, 2000, and records concerning the purchase of the money order by defendant on July 3, 2000.

On August 1, 2000, Special Agent Roncinske subpoenaed records of Triad Financial Corporation.  These records showed a payment of defendant's loan on June 6, 2000.

## A.  Motion to Suppress Evidence and Derivative Evidence From Search of Motor Vehicle on July 6, 2000 (Doc. #98)

Defendant's motion argues that the search of his pick-up truck violated his Fourth Amendment rights.  He seeks to suppress the Money Corner receipt obtained from the vehicle, as well as the derivative evidence obtained from the Money Corner store and the evidence obtained from and the testimony of Mr. Loffreno. It is clear that "the exclusionary rule applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence." Nix v. Williams, 467 U.S. 431, 441 (1984).  See also United States v. Terzado-Madruga, 897 F.2d 1099, 1112-13 (11th Cir. 1990).

**(1)**

Under the version of the facts set forth in the motion, the legality of the search of the vehicle is governed by New York v. Belton, 453 U.S. 454 (1981), as clarified by Thornton v. United States, 541 U.S. 615 (2004).  Thornton first held that "Belton governs even when an officer does not make contact until the person arrested has left the vehicle."  541 U.S. at 617.  In Thornton a suspect who had left his vehicle was arrested, handcuffed, and placed in the back seat of a patrol vehicle.  The officer then searched the vehicle and discovered evidence under the driver's seat.  After reviewing its prior decisions, the Supreme Court stated "[i]n all relevant aspects, the arrest of a suspect who is next to a vehicle presents identical concerns regarding officer safety and the destruction of evidence as the arrest of one who is inside the vehicle."  Id. at  621.  The Supreme Court further stated that "Belton allows police to search the passenger compartment of a vehicle incident to a lawful custodial arrest of both 'occupants' and 'recent occupants.'"  Id. at 622.  It further stated: "In any event, while an arrestee's status as a 'recent occupant' may turn on his temporal or spatial relationship to the car at the time of the arrest and the search, it certainly does not turn on whether he was inside or outside the car at the moment that the officer first initiated contact with him."  Id.

The evidence at the suppression hearing established that the seizure of the receipt did not occur in the Publix parking lot,

-11-

although defendant asserts that a search did take place there.
Assuming defendant's version of the facts is true, he was arguably
arrested when he stopped in response to the officers' calling his
name.  The arrest was lawful, since the Court finds that credible
evidence established that defendant was observed by at least Deputy
Jakacki driving a motor vehicle with an expired license tag and
while his driver's license was suspended.  The Court also concludes
that the officer(s) were authorized to conduct the search of the
vehicle incident to defendant's lawful arrest.  Defendant was
lawfully arrested for the state misdemeanor offense of Driving
While License Suspended, which had been committed in at least
Deputy Jakacki's presence.  The Court further finds that defendant
Moore was a "recent occupant" of the vehicle, that he was no more
than approximately 90 feet from vehicle when stopped by the
officers, and that the stop occurred within seconds after he exited
the vehicle.   The temporal and spatial relationship between
defendant and the pick-up truck made the search reasonable, and not
a violation of defendant's Fourth Amendment rights.  Additionally,
although defendant asserts that there was a "short search" of his
vehicle, he concedes that nothing was removed.

**(2)**

The legality of the seizure of the wire transfer receipt is
primarily governed by principles of an inventory search.  A proper
inventory search conducted according to standardized criteria

constitutes one of the well-defined exceptions to the probable cause and warrant requirements of the Fourth Amendment.  South Dakota v. Opperman, 428 U.S. 364 (1976); Illinois v. Lafayette, 462 U.S. 640 (1983); Colorado v. Bertine, 479 U.S. 367 (1987); Florida v. Wells, 495 U.S. 1 (1990).  In order to uphold a search under the inventory search doctrine, the police must first have the authority to impound the vehicle and must then follow the procedures outlined in their standardized policy. Bertine, 479 U.S. at 375; United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991).

Police may lawfully impound a vehicle when they have arrested its occupant, even if the vehicle is not impeding traffic or otherwise presenting a hazard, "so long as the decision to impound is made on the basis of standard criteria and on the basis of 'something other than suspicion of evidence of criminal activity.'" Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992).  "[C]ase law requires that the decision to impound Sammons' vehicle have been made in good faith, based upon standard criteria, and not solely based upon 'suspicion of evidence of criminal activity.'" Id. at 1543 (citation omitted).  The government bears the burden of proving these elements.  Id.  "If the vehicle has been lawfully impounded, the law enforcement officer may conduct an inventory search, including a search of closed containers, provided the search is conducted pursuant to standardized criteria."  Id.

The requirement of a standardized policy or an established routine ensures that an inventory search is not a ruse for a

-13-

general search to discover incriminating evidence.  <u>Wells</u>, 495 U.S. at 3.  "An inventory search is not a surrogate for investigation, and the scope of an inventory search may not exceed that necessary to accomplish the ends of the inventory."  <u>United States v. Khoury</u>, 901 F.2d 948, 958 (11th Cir.), <u>opinion modified on denial of reh'g</u>, 910 F.2d 713 (1990).  On the other hand, a legitimate inventory search is not invalidated simply because the officer has an expectation of finding evidence during the inventory search. <u>United States v. Roberson</u>, 897 F.2d 1092, 1096 (11th Cir. 1990); <u>Khoury</u>, 901 F.2d at 959.  The inventory search is permissibly thorough so long as it is consistent with the police caretaking function.  <u>United States v. O'Bryant</u>, 775 F.2d 1528, 1534 (11th Cir. 1985).  Police do not violate the Fourth Amendment merely by impounding a vehicle rather than permitting an arrestee to make alternative arrangements for its disposition; the option of being allowed to make such an alternative arrangement is simply not constitutionally required.  <u>Bertine</u>, 479 U.S. at 373-74; <u>Robinson v. State</u>, 537 So. 2d 95 (Fla. 1989).

The Court finds that the decision to impound vehicle was made in good faith, based upon standard criteria contained in written LCSO policies, and was not based upon suspicion of evidence of criminal activity.  The vehicle had been used in the commission of a misdemeanor criminal offense, and its occupant had been lawfully arrested.  The LCSO written policy and standard practice authorized the towing of the vehicle in such circumstances, and the Court

finds that the vehicle was towed in good faith and not as a pretext to search for evidence.  Indeed, Deputy Jakacki (and under defendant's version two other deputies) allowed the vehicle to be impounded without doing the inventory search required by LCSO policy whenever a vehicle is towed.  Additionally, the public had full access to the Publix parking lot, and this substantial risk to the vehicle justified impoundment.  E.g., Hitchcock v. State, 746 So. 2d 1143, 1144 (Fla. 5th DCA 1999).  The impoundment of the truck was therefore lawful.

The Court also concludes that the inventory search was proper. This search was done pursuant to written LCSO policies, although on a delayed basis.  The primary issue in the Court's view is whether Lt. Crone was credible in his testimony that he conducted the inventory essentially to fix an omission by an officer under his command during his watch, or whether it was simply a pretext to assist the FBI bank robbery investigation.  The Court found Lt. Crone to be credible in his testimony.  Lt. Crone had no prior involvement in the bank robberies investigation, and learned of the omission during the interview of defendant.  The inventory of the vehicle was consistent with the policy and practice of the LCSO, and an officer is not obligated to turn a blind eye to documents which may have evidentiary value.  The delay in the performance of the inventory does not render it unlawful.  Florida v. Meyers, 466 U.S. 380 (1984).

(3)

Alternatively, the government argues that even if the inventory search of the truck violated the Fourth Amendment, the exclusionary rule does not require suppression. The government relies on "three closely related but analytically distinct exceptions to the exclusionary rule." Terzado-Madruga, 897 F.2d at 1113.

The government first argues that the evidence is admissible because its discovery was inevitable. In Nix, the Supreme Court held that evidence otherwise subject to suppression is nonetheless admissible if it inevitably would have been discovered by lawful means had the illegal conduct not occurred. 467 U.S. at 444. The government must prove by a preponderance of evidence that the item ultimately or inevitably would have been discovered by such lawful means. Id. For evidence to qualify under this exception, the Eleventh Circuit requires that "there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." Jefferson v. Fountain, 382 F.3d 1286, 1296 (11th Cir. 2004)(citing United States v. Brookins, 614 F.2d 1037, 1042 n.3 (5th Cir. 1980)).

The government also argues that the evidence is admissible because there is an independent source for the evidence other than

-16-

the illegal search of the vehicle.   <u>United States v. Davis</u> sets forth the applicable principles:

> In determining whether evidence is "fruit of the poisonous tree" and, therefore, must be excluded, the relevant question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  The government may "purge the taint" by proving that there was a break in the causal link between the initial illegal search and the eventual seizure, such as by establishing that the evidence in question was seized pursuant to an independent source.   Under the "independent source" doctrine, the challenged evidence is admissible if it was obtained from a lawful source, independent of the illegal conduct.

313 F.3d 1300, 1303 (11th Cir. 2002)(citations omitted).

Finally, the government argues that the evidence is admissible because of attenuation, i.e., the causal connection between the illegal search and the discovery of the evidence is so attenuated as to dissipate the taint.   <u>United States v. Ceccolini</u>, 435 U.S. 268, 273 (1978).   There must be some causal connection in order for this exception to apply.   <u>Terzado-Madruga</u>, 897 F.2d at 1116.

Applying these principles, the Court would find that if the inventory search was illegal the use of the receipt during the July 6 and 7, 2000, interview of defendant was tainted and not within any of the exceptions, and that portion of defendant's statement must be suppressed.   The Court finds that neither the landlord's testimony nor his records were obtained as a result of the inventory search, and therefore would not be suppressed in any

event.  Additionally, they were obtained by an independent source even if tainted.  The Court finds that the evidence from the Money Corner store does not fall within the inevitable discovery exception as interpreted by the Eleventh Circuit, but that the government has established an independent source for that evidence. Also, there is an independent source for the receipt, but not for defendant's statement regarding the receipt.

**B.  Motion to Suppress Evidence Seized During Execution of a Search Warrant in the Nighttime (Doc. #100)**

Defendant argues that the state search warrant for his home was federal in nature, and therefore its execution had to comply with Rule 41, Federal Rules of Criminal Procedure.  In July, 2000, Rule 41(c)(1) provided in part: "The warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime."  The term "daytime" was defined as the hours of 6:00 a.m. and 10:00 p.m. <u>See</u> Fed. R. Crim. P. 41(h).

As discussed above, Detective Nosbusch obtained the state search warrant on July 7, 2000, at 1:45 a.m, and executed it on July 7, 2000, at 2:15 a.m., while defendant was still in custody from his Driving While License Suspended arrest.  The search warrant authorized officers to execute the warrant "in the daytime

or nighttime as the exigencies of the occasion may demand or require . . . ." Government Exhibit 7.

The government argues that the search of defendant's home was not "federal in execution" and therefore was not required to comply with Rule 41.  The government asserts that the state and federal bank robberies investigations, while concurrent, were independent; that state officers conducted their own surveillance of Moore without assistance from federal agents; that state agents arrested Moore without direction by federal agents; that state officers applied for, received, and executed the state court search warrant; that while an FBI agent was involved in discussions about obtaining a search warrant, the FBI did not initiate the process or direct state officers to get the warrant; and that the officers executing the warrant believed that charges would be pursued in state court.

United States v Lehder-Rivas summarizes the Eleventh Circuit's law as to when a state search warrant is governed by federal law:

> A state search warrant must comply with federal standards if the search was "federal in execution".  A search is federal in execution if a federal official "had a hand in it . . . The decisive factor . . . is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means."  In the instant case, federal agents provided intelligence information to the state officers involved.  The warrant was therefore "federal in character" and subject to Rule 41 of the Federal Rules of Criminal Procedure. (citations omitted).

955 F.2d 1510, 1522 (11th Cir.), cert. denied, 506 U.S. 924 (1992).

Since simply providing intelligence information to the state

officers was sufficient to constitute being "federal in character,"

the standard is apparently not strenuous.  The Court concludes that

the search warrant in this case was "federal in character" because

some of the information used in the Affidavit For Search Warrant,

Government Exhibit 7, had to have come from Special Agent

Roncinske.  The Affidavit states in part: "Another friend whose

name Moore provided viewed the surveillance photographs and

positively identified Moore."  The two officers who were present

during the interview when Moore provided the name Richard Sahs were

Special Agent Roncinske and Lt. Crone.  Lt. Crone testified that he

knew nothing about a search warrant being prepared for defendant's

house, so the information in the Affidavit most likely originated

with Special Agent Roncinske.  The government's reliance upon

United States v. Palmer, 3 F.3d 300, 302 (9th Cir. 1993) is

misplaced to the extent the Eleventh Circuit law is simply

different.

If writing on a clean slate the Court would find that only

those portions of Rule 41 which are constitutionally mandated must

be followed by state officers in a "federal" search as here.  It

was such constitutional standards that were referenced in United

States v Gilbert, 942 F.2d 1537, 1541-42 (11th Cir. 1991), cert.

denied 503 U.S. 949 (1992), relied upon by Lehder-Rivas.  The

daytime execution of a search warrant requirement of Rule 41 is not

required by the Fourth Amendment, since no special showing is constitutionally required for a nighttime execution of a search warrant. <u>Gooding v. United States</u>, 416 U.S. 430 (1974). This position is foreclosed, however, by <u>Lehder-Rivas</u>, which compelled compliance with a Rule 41 requirement which was not constitutionally mandated.

The government argues that even if the search was federal in execution and the Rule 41 requirements were mandatory, the remedy for failure to comply with Rule 41(c)(1) is not suppression of evidence. The Court agrees. It is certainly correct that the issue of suppression as a sanction is separate from the issue of whether the Fourth Amendment rights have been violated. <u>United States v. Leon</u>, 468 U.S. 897, 906 (1984). Suppression is only required if the conduct violated federal <u>constitutional</u> principles. <u>Gilbert</u>, 942 F.2d at 1540-41; <u>United States v. Maholy</u>, 1 F.3d 718, 721 (8th Cir. 1993). Non-compliance with federal rules will result in the suppression of evidence **only** if the search violated the Fourth Amendment, i.e., it was unreasonable. <u>United States v. Gerber</u>, 994 F.2d 1556, 1559 (11th Cir. 1993). The Court finds that even if the Affidavit fails to satisfy Rule 41(c)(1), suppression is not justified.

Finally, <u>Lehder-Rivas</u>, 955 F.2d at 1522 held that suppression was not necessary because, under <u>United States v. Leon</u>, 468 U.S. 897 (1984), the officers acted in objective good faith. The issue is whether reasonably well trained officers would have recognized

that the execution of the search warrant in the nighttime was illegal despite the state judge's authorization. The Court finds that the officers in this case believed the prosecution was going to be in state court, and at all times acted in good faith in obtaining and executing a state court search warrant. Only state officers conducted the search; only a state officer completed the affidavit before a state judge. The process used to obtain the search warrant and request for search warrant complied fully with Florida law. The Court finds that a reasonable Florida officer would follow Florida procedures rather than the federal rules in the circumstances of this case. Therefore, even if there was a violation of Rule 41(c)(1), the Court finds the conduct falls well within the <u>Leon</u> good faith rule.

## III.

The Court finds that the following facts were proven as to the relevant 2005 bank robberies and the subsequent investigations:

On January 31, 2005, a Bank of America in North Fort Myers was the subject of an attempted robbery by a man who handed a teller a note demanding $2,000 or he would shoot. On February 1, 2005, a First National Bank in Cape Coral was robbed shortly after noon by a person matching the description of the person who attempted to rob the Bank of America. Law enforcement officers developed probable cause to believe defendant Moore was the perpetrator of both the attempted robbery and the robbery. The existence of such

probable cause is not contested, for purposes of the motion, by defendant.

Officers determined that defendant had rented two rooms in a Motel 6 beginning January 28, 2005, and that defendant paid his room balance at approximately 2:00 p.m. on February 1, 2005, using $100 bills.  At about 5:00 p.m. on February 1, 2005, officers saw Moore arrive at the motel driving a truck and observed him park the vehicle and enter Room 300, a ground floor room.  The officers were unable to reach Moore before he entered the room.  After discussing the matter, the officers decided to knock on the door and see if defendant would come out.  If not, they would get a search warrant.

The officers evacuated the adjoining rooms, and positioned officers covertly behind "hard cover" in the parking lot surrounding the motel.  There were approximately a dozen officers in the area at the time, all with weapons aimed at the room door. Detective Bobby Godwin stood with his back against the exterior wall on the right side of the door with his gun drawn; Sgt. Gary Vayo stood with his back against the exterior wall on the left side of the door and room window with his gun drawn.  Detective Godwin knocked on the motel room door and said "Lee County Sheriff's Office."  After about 15 seconds defendant opened the door and stepped across the threshold.  When he was even with Detective Godwin, Detective Godwin put his gun to defendant, grabbed defendant's arm, told him to show his hands, and ordered defendant

to the sidewalk.  Defendant was secured on the sidewalk and told he was under arrest.

Defendant testified that about thirty minutes after he entered his motel room there was a knock on the door and someone said "Open the door.  Lee County Sheriff's Office."  Defendant looked out the door peephole and saw numerous officers moving toward the room with guns drawn.  Believing they were the police, defendant opened the door.  While he was standing in the door threshold, an officer pulled him outside and took him to the ground where he was handcuffed.  The upper portion of his body was on the sidewalk while his legs were still in the motel room.

Sgt. Vayo and another officer then entered Room 300 to conduct a protective sweep for other persons.  Although no one else was found in the room, Sgt. Vayo observed what appeared to be hair that had been shaven lying in the bathroom sink and shaving gear. Nothing was seized.

Defendant was booked into the county jail.  The officers then obtained a state search warrant for the two motel rooms.  Execution of the search warrant resulted in the seizure of various items of evidence the government intends to use at trial.  The only item at issue is the shaving gear.

**A.  Motion to Suppress Evidence and Derivative Evidence from the Search of Defendant's Motel Room on February 1, 2005 (Doc. #99),**

Defendant argues that officers unlawfully arrested him in his "home" without an arrest warrant or a search warrant, and that the subsequent search warrant was based in part on the observations made by officers when they illegally searched his motel room.

One's home receives the greatest Fourth Amendment protection. "It is a basic principle of Fourth Amendment law that search and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980); United States v. Gonzalez, 71 F.3d 819, 827 (11th Cir. 1996). The government concedes in this case that the hotel room was the functional equivalent of Moore's home, and was thus entitled to the protection of the Fourth Amendment. United States v. Standridge, 810 F.2d 1034 (11th Cir. 1987), cert. denied, 481 U.S. 1072 (1987).

It is well settled that law enforcement officers cannot lawfully enter a suspect's home to make a felony arrest without (1) a search warrant or an arrest warrant, or (2) consent, or (3) probable cause coupled with exigent circumstances. Payton v. New York, 445 U.S. 573 (1980); McGough, 412 F.3d at 1236-37. "The Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton, 445 U.S. at 590. The purpose is not to protect the person of the suspect, but to protect the home from entry in the absence of a judge's finding of probable cause. Minnesota v. Olson, 495 U.S. 91, 95 (1990). Supreme Court cases since Payton have consistently applied these

requirements to protect the sanctity of a suspect's home or its equivalent: <u>Steagald v. United States</u>, 451 U.S. 204 (1981)(search warrant, not just arrest warrant, is needed to enter house of third party in the absent of consent or exigent circumstances); <u>Welsh v. Wisconsin</u>, 466 U.S. 740 (1984) (exigent circumstance exception to <u>Payton</u> warrant requirement is rarely applicable to nonjailable traffic offense); <u>New York v. Harris</u>, 495 U.S. 14, 21 (1990) (arrest of suspect in his apartment for murder with probable cause but without a warrant or exigent circumstances violated <u>Payton</u>; but "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of <u>Payton</u>."); <u>Minnesota v. Olson</u>, 495 U.S. 91 (1990) (warrantless entry into apartment to arrest overnight guest violated <u>Payton</u> and was not justified by exigent circumstances); <u>Kirk v. Louisiana</u>, 536 U.S. 635 (2002)(<u>Payton</u> makes plain that police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.  Probable cause alone is not sufficient).  The government has burden of proving an exception to the warrant requirement.  <u>McGough</u>, 412 F.3d at 1237 n.4.

No warrant of any kind, however, is needed to arrest a suspect in a public place if probable cause exists.  <u>United States v. Watson</u>, 423 U.S. 411 (1976).  Officers can make a warrantless arrest in a public place when the officer has probable cause to

believe felony has occurred.  United States v. Goddard, 312 F.3d 1360 (11th Cir. 2002), cert. denied, 538 U.S. 969 (2003).

Officers with probable cause to believe defendant committed offense and at least reasonable suspicion that defendant is in his residence do not violate any of defendant's rights by approaching his front door and knocking.  United States v. Tobin, 923 F.2d 1506, 1511-12 (11th Cir.)(en banc), cert. denied 502 U.S. 907 (1991); United States v. Knight, 451 F.2d 275, 278-79 (5th Cir. 1971), cert. denied 405 U.S. 965 (1972).  There was no improper conduct if an officer identifies himself as a police officer and states he needed to speak with defendant.  Tobin, 923 F.2d at 1512.

Additionally, there is no Payton violation when a defendant is arrested outside the residence.  In Knight v. Jacobsen, officers knocked on the door and told the occupant to step outside.  300 F.3d 1272, 1277-78 (11th Cir. 2002).  The occupant did so and was arrested outside the door.  Id.  The Eleventh Circuit stated: "Payton keeps the officer's body outside the threshold, not his voice.  It does not prevent a law enforcement officer from telling a suspect to step outside his home and then arresting him without a warrant."  Id.  The officer never crossed the firm line at the entrance of the house, and Knight held that Payton prohibits only warrentless entry, not a policeman's voice to convey a message of arrest from outside the home.  Id.

Having heard the testimony and observed the demeanor of all the witnesses, the Court credits the testimony of Detective Godwin

and Sgt. Vayo over that of defendant.   The Court finds that defendant was arrested outside the threshold of the motel room, as described by Detective Godwin, and not in the motel room.   The Court finds that the arrest was not unlawful under Payton and its progeny.

A different situation is presented, however, if officers deliberately create circumstances in an attempt to circumvent the requirements of the Fourth Amendment or coerce the occupant to leave his home.   Tobin, 923 F.2d at 1511.   Knight found that its facts did not involve coercive tactics by police, just a simple direction by one officer to step outside.   300 F.3d at 1277-78 n.5. In United States v. Edmondson, the Court found that a defendant who opened his door after being ordered to do so by an FBI agent, stepped back, and placed his hands on his head had not consented to the entry into his residence.   791 F.2d 1512, 1515 (11th Cir. 1986).   "A suspect does not consent to being arrested within his residence when his consent to the entry into his residence is prompted by a show of official authority."   Id.   In United States v. Ramirez-Chilel, officers knocked on door at midnight without warrant or probable cause, but hoping for consent to search.   289 F.3d 744, 746 (11th Cir. 2002).   Defendant opened the door and stepped aside, which the officers interpreted as consent to enter. Id. at 752.   The Eleventh Circuit noted that entry is illegal if prompted by a show of official authority, but found none in this case.   Id. at 751.   The officers' guns were not drawn, there was

not a large number of officers surrounding house, and defendant did not act intimidated.  Id.   Therefore, no official show of force existed which "forced" defendant to let officers in.

The Court frankly doubts the veracity of defendant's testimony that he could see from the peephole many officers in the parking lot with guns drawn after the officer knocked on the door.  While that officers were certainly there, the credible testimony established that until defendant opened the door they were operating in a covert fashion and were positioned behind hard cover.  The Court finds that there was not a show of force which compelled defendant to open the door or exit the room.

Having lawfully arrested defendant, the officers could properly perform a protective sweep.  Maryland v. Buie, 494 U.S. 325 (1990).  The Court finds that the protective sweep in this case was lawful, and the observations made by Sgt. Vayo were proper. Indeed, Sgt. Vayo would have been entitled to seize the shaving related evidence located in plain view, but did not do so.

The Search Warrant the officers obtained was valid, but did not properly cover the shaving gear.  While the shaving gear was specifically listed as an item to be seized, the affidavit contained no facts justifying such seizure.  However, the officers properly executed the warrant as to the other items, saw the shaving gear in plain view, and were authorized to seize it pursuant to the plain view exception.

Accordingly, it is now

**ORDERED:**

1.   Defendant's Motion to Suppress Evidence and Derivative Evidence From Search of Motor Vehicle on July 6, 2000 (Doc. #98) is **DENIED.**

2.   Defendant's Motion to Suppress Evidence and Derivative Evidence from the Search of Defendant's Motel Room on February 1, 2005 (Doc. #99) is **DENIED.**

3.   Defendant's Motion to Suppress Evidence Seized During Execution of a Search Warrant in the Nighttime (Doc. #100) is **DENIED.**

**DONE AND ORDERED** at Fort Myers, Florida, this   7th   day of March, 2006.


JOHN E. STEELE
United States District Judge

Copies:
AUSA
Counsel of Record